UNITED STATES of America, Appellee,

v.

Joseph Motley WHITEHEAD, Appellant.

UNITED STATES of America, Appellee,

v.

Wayne HOLLEY, Appellant.

UNITED STATES of America, Appellee,

v.

Aubrey HENDERSON, Appellant.

Nos. 78–5160 to 78–5162.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 3, 1979.
Decided March 20, 1980.

David Epstein, Washington, D. C. (Mary Beth Schiffman, David Kolman Tochen, Washington, D. C., Joseph R. Johnson, Jr., Lynchburg, Va., on brief), for appellant Whitehead.

William Rosenberger, Jr., Lynchburg, Va. (Killis T. Howard, Richard E. Spies, Lynchburg, Va., on brief), for appellant Henderson.

George H. Fralin, Jr., Norman A. Kinnier, Lynchburg, Va., on brief, for appellant Holley.

Robert S. Stubbs, Asst. U. S. Atty., Roanoke, Va. (Paul R. Thomson, Jr., U. S. Atty., Roanoke, Va., on brief), for appellee.

Before WINTER, RUSSELL and HALL, Circuit Judges.

K. K. HALL, Circuit Judge:

 Appellants were convicted, following a month-long trial, of violating the federal Racketeer Influenced and Corrupt Organization statute, 18 U.S.C. § 1962(c) [RICO], by promoting an interstate prostitution ring through a bribery scheme, and of conspiracy to commit that offense, in violation of 18 U.S.C. § 1962(d).[1] Appellant Henderson was also convicted of four counts of violating 18 U.S.C. § 1952 [the Travel Act] by traveling, and causing prostitutes to travel, in interstate commerce to promote the prostitution enterprise. On appeal, they contend that various trial errors, including evidentiary rulings by the district court and allegedly improper prosecutorial comments, mandate a reversal of their convictions. Appellant Henderson also assigns error to the district court's refusal to grant him a severance.[2] We are convinced that none of the alleged errors, singly or in combination, deprived appellants of a fair trial, and we affirm the convictions.

A 1977 indictment charged that Harold Wayne Dowdy, Herbert Owen Boyd, Thomas James Barker and Appellant Henderson operated an interstate prostitution ring centered in Pittsylvania County, Virginia. The indictment further charged that Appellant Whitehead, who was Commonwealth Attorney for Pittsylvania County from 1964 through 1975, offered protection to the prostitution ring, including advance warning of planned raids and leniency in prosecution, in return for cash payments from the operators and free sexual services from prostitutes employed by the ring. Appellant Holley, a Pittsylvania County businessman and friend of Whitehead, was charged with serving as "bagman" for the cash payments, in return for free sexual services. The four operators were accused of numerous violations of the Travel Act, and they, along with Whitehead and Holley, were also charged with both conspiring to violate, and violating, the RICO statute.

1. The RICO statute provides, *inter alia*:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . . 18 U.S.C. § 1962(c).

The statute defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The statute's definition of "racketeering activity" specifically includes bribery. 18 U.S.C. § 1961(1).

After the briefs in this case were filed, a Sixth Circuit panel decision held that the RICO statute was intended to prevent the corruption of legitimate organizations, and that the statute therefore is inapplicable where racketeering activity is used to promote an "enterprise" which is itself unlawful. *United States v. Sutton*, 605 F.2d 260 (6th Cir. 1979) (en banc rehearing pending). Appellants, relying on the *Sutton* panel opinion, now contend that their convictions must be reversed because the "enterprise" involved in this case, i. e., prostitution, is itself illegal.

While we agree with the Sixth Circuit panel's statement that there is little "surface appeal" to the idea "that racketeers should be immune from criminal liability under the statute so long as they keep their activities wholly illegitimate," 605 F.2d at 264, we disagree with the panel's conclusion that this unappealing result is compelled by the statute's history. Although it is clear that infiltration of legitimate businesses by organized crime was a primary concern of Congress in enacting RICO, we join every other circuit which has considered the issue in concluding that the statute itself is not so limited, and that its prohibitions apply to the use of racketeering activities to promote *any* enterprise affecting interstate commerce. *United States v. Aleman*, 609 F.2d 298 (7th Cir. 1979); *Manchester v. United States*, 605 F.2d 1198 (3d Cir. 1979); *United States v. Rone*, 598 F.2d 564 (9th Cir. 1979); *United States v. Elliott*, 571 F.2d 880 (5th Cir. 1978); *United States v. Altese*, 542 F.2d 104 (2d Cir. 1976).

2. Appellant Henderson also contends that his sentence of twenty years' imprisonment and a $50,000 fine (later corrected to $25,000) constitutes cruel and unusual punishment. We find this argument frivolous.

Dowdy, Boyd and Barker, pursuant to agreements with the prosecution, entered pleas of guilty to the RICO conspiracy charge and to Travel Act violations, and appeared as government witnesses at Appellants' trial. They testified that Whitehead had approached them, through Holley, and demanded regular cash payments in return for allowing them to remain in business. They also stated that the cash payments, to Whitehead through Holley, had begun in 1973 and continued at least through the end of Whitehead's term in 1975.[3]

The testimony of the three operators was corroborated by that of numerous prostitutes who had worked for them or for Henderson, and who testified to the extraordinary services provided to Whitehead and Holley in exchange for promises of protection.[4] State and local law enforcement officers testified that Appellant Whitehead had made vigorous, and largely successful, efforts during his first term of office to close the houses of prostitution operating in the county, but that prostitution activity had proliferated in the county by 1973, the time when the alleged payoff scheme began. Two officers also testified that, following a 1974 raid on local prostitution establishments, Whitehead had attempted to

3. Barker testified that he began making payoffs in 1974, after a visit by Whitehead was followed by a raid by the county sheriff's department. He stopped making payments, and closed his establishment, following a state police raid in 1975.

Dowdy continued making payments after Whitehead had left office, on the belief that Whitehead's influence in the community would still prove useful.

4. The services included private "parties" for Whitehead and Holley at the houses of prostitution, during which the establishments would be closed to other patrons. The prostitutes also provided "out services" at Whitehead's house, a special service provided to no other customers. Neither Whitehead nor Holley ever paid for these services, although the prostitutes were compensated by the operators.

The witnesses testified that most of Whitehead's promises went unfulfilled. Although Whitehead identified undercover agents to Henderson, who later described them to others,

curb the activities of a deputy sheriff who was continuing the investigation, by ordering him to stay away from one of Dowdy's establishments, and by attempting to have him fired for "harassing" the operators.

The government's witnesses also testified that Whitehead had instructed the four operators to cooperate with one another, and that the operators' cooperation included sharing prostitutes, jointly conducting "parties" for Whitehead and Holley, sharing information regarding law enforcement activities, and planning strategy following the 1974 raids.

None of appellants testified at trial. After three days of deliberation, the jury returned guilty verdicts aga st all appellants on the RICO conspiracy nd substantive counts, and against Hen rson on four Travel Act counts.[5] Appel nts raise numerous issues on appeal, only two of which merit extended discussion.

## I. *Prosecutorial Comments*

Appellants contend that on three occasions during trial, the prosecutor adversely commented on the defendant's failure to testify. We believe that only one of these instances even arguably constitutes such an improper comment.[6] Near the end

Whitehead failed to provide advance notice of raids by state and county police. Whitehead also promised, during a "party" at one of the establishments, to "take care of" the arrest record of a prostitute arrested during an earlier raid, but never fulfilled this promise.

5. The jury was unable to agree on a fifth Travel Act count against Henderson.

6. The second comment cited by appellants was in the form of an objection by the government to a question asked of Herbert Owen Boyd, during defense counsel's attempt to impeach Boyd through his earlier testimony to a federal grand jury:

Q: This is page 14. You were asked the question by the prosecutor: "Have you ever made any pay-offs or paid any protection money for your operation at the Hillcrest or any of the other establishments that you've run in the last five years?" Your answer was, "I'd like to take the Fifth on it, because . . . ."

Prosecutor: I want to object to this, Your Honor. They certainly would object and

of the government's direct examination of Harold Wayne Dowdy, after questioning regarding Dowdy's earlier conviction on charges of tax evasion, the following exchange occurred:

Q. Now in your tax evasion, did you take the stand and testify in your own behalf?

A. No.

Q. Why not?

A. If I would have testified to the truth, it would have convicted me, and if I would have lied under oath, I would have been guilty of perjury. I would not lie under oath.

Appellants did not object to either question at the time it was asked, but a short time later they moved for a mistrial, contending that the questioning was a deliberate attempt by the prosecution to indirectly state that avoidance of perjury was the reason for their failure to take the stand. The district court denied the motion, ruling that the questioning was simply an attempt to bolster Dowdy's credibility.[7] The court's offer to strike the questions and answers, and to instruct the jury appropriately, was refused by defendants.

We recognize that "[c]rafty questioning may constitute 'comment' despite its obliquity," *United States v. Helina*, 549 F.2d 713, 718 (9th Cir. 1977). The test for determining whether an indirect remark constitutes improper comment on a defendant's failure to testify is: "Was the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to *be a comment* on the failure of the accused to testify." *United States v. Anderson*, 481 F.2d 685, 701 (4th Cir. 1973), aff'd 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974) [quoting *United States ex rel. Leak v. Follette*, 418 F.2d 1266 (2d Cir. 1969)]. Applying this rule, we do not believe that the questioning can be fairly read as a comment on appellant's failure to testify. Even assuming, as appellants contend, that both the questions and answers were carefully planned by the prosecutor, we believe that their "manifest intent," as well as their likely impact on the jury, was confined to a comment on Dowdy's probable veracity while testifying under oath. Moreover, the jury was repeatedly instructed, throughout the trial, that no adverse inferences should be drawn from defendants' decision not to

raise the roof if I did that when Mr. Whitehead or one of the defendants was on the stand. I don't think it's proper method of impeachment, when a person relies on his Fifth Amendment Constitutional right not to testify as to matters that might incriminate him.

According to appellants, this comment equated their silence during trial with "incrimination." We do not believe that there is even a remote likelihood that the jury interpreted this remark as a statement that appellant's failure to testify was due to a fear of incrimination, and we see nothing improper in the comment.

The third remark occurred during the prosecutor's closing argument. In response to defense counsel's repeated attempts to discredit Dowdy, Boyd and Barker on the basis that their testimony was a fabrication for the purpose of obtaining leniency in sentencing, the prosecutor stated:

As for Tommy Barker's deal with the government, he is staring at thirty years potentially. Now what we think about whether he was truthful or not is not terribly important. It is the Court who is going to sentence him. The Court is the one who is going to judge his credibility as to his sentencing and whether

it's worth anything to him. If he can't convince the Court that he's telling the truth, then it doesn't really matter what he says. He's not rrying [sic] to impress you. He's trying to impress the Judge that he's telling the truth, and that same goes for Mr. Dowdy, and the same goes for Mr. Boyd. They aren't trying to impress us. They aren't trying to impress you. They're trying to impress the Judge that they are telling the truth. If any of you watched the Court while they were testifying, the Court was paying a lot of attention to whether he thought they were telling the truth.

Appellants argue that the remark necessarily implied that defendants who decline to testify do so out of fear that they will appear untruthful to the court. Again, we find this argument without merit.

7. The court noted that, until appellant's mistrial motion, it had not even occurred to the court that the remark could be considered to relate to appellants. The court further remarked that, at the stage in the trial when the remark was made, it was not known whether appellants would in fact take the stand.

testify. We are convinced that "the jury in all probability did not understand the government to be commenting on [the defendants'] failure to testify, but that, if it did, the judge's instructions were sufficient to cure that impression." *United States v. Adamo*, 534 F.2d 31, 40 (3d Cir. 1976).

Appellants also contend that the prosecutor's opening and closing arguments contained improper remarks, including attacks on defense counsel, comments on the credibility of government witnesses, and comments on matters not in evidence. "Improper argument by the prosecutor is not grounds for reversal unless there is 'substantial prejudice as well as error.'" *United States v. Kim*, 193 U.S.App.D.C. 370, 383, 595 F.2d 755, 768 (D.C.Cir.1979). After examining these remarks in context, we are convinced that any error was minor and did not result in substantial prejudice to appellants.

## II. *Whitehead Impeachment Material*

Shortly before the defense rested, Appellant Whitehead's counsel informed the court that "because of the circumstances that have occurred during the course of this trial . . . we feel compelled to put Mr. Whitehead on the stand and have him testify." Defense counsel requested an advance ruling from the court, "before making a final decision" on whether Whitehead would take the stand, on the admissibility of evidence concerning Whitehead's 1975 suspension from practice from the Virginia State Bar for "conduct involving deceit or misrepresentation."[8] Whitehead contended that neither the fact that he had been suspended, nor the document containing the

disciplinary tribunal's decision, was admissible under the Federal Rules of Evidence for purposes of impeaching his credibility. Counsel represented that if the district court ruled that Whitehead could not be impeached on the basis of his suspension from the Virginia bar, he would testify in the case. The district court ruled that Whitehead could be cross-examined about his suspension under FRE 608(b)[9] as a "specific instance of conduct . . . probative of truthfulness," and that if Whitehead testified about the suspension, the document evidencing it could be introduced.

Whitehead's counsel never stated unequivocally that a ruling permitting cross-examination about the suspension, as distinguished from admission of the document, would cause Whitehead to decide not to testify.[10] Even after the court's ruling, defense counsel's response was limited to the request, "[w]ell, could we have a little time to consult with our client and see what . . . ." Thereafter, Whitehead decided not to take the stand. He has never made a proffer of what his testimony would have been.

Whitehead now contends that the district court's ruling deprived him of his constitutional right to testify as a witness on his own behalf, and was, *per se*, reversible error. We disagree. Although we reject the government's argument that Whitehead, by deciding not to testify and thus subject himself to the potential impeachment, has waived any objection to the district court's ruling, we hold that the district court's ruling that Whitehead might be cross-examined about the suspension was

---

**8.** The suspension was based on conduct which occurred in 1969.

**9.** FRE 608(b) provides:

(b) Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of a witness (1)

concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

**10.** At the same time that defense counsel requested a ruling concerning the Whitehead suspension, they also asked for an advance ruling on the admissibility of evidence that Appellant Holley had been recently indicted for perjury. Although the district court ruled the pending indictment inadmissible, Holley also decided not to testify.

correct. Although we think that the ruling that the suspension document was also admissible was incorrect, we think that the error was harmless.

■ Prior to the enactment of the Federal Rules of Evidence, disbarment or suspension of an attorney was uniformly considered to be a proper subject for impeachment. *See, e. g.,* McCormick on Evidence, § 43 at 86 (1972 ed.); *United States v. Rubenstein,* 151 F.2d 915 (2d Cir. 1945). Since the enactment of the rules, two courts of appeals have considered this issue or related questions and have held that the witness may be asked about the disciplinary action as well as the underlying misdeed. *See United States v. Ruiz,* 579 F.2d 670 (1st Cir. 1968) (policemen may be interrogated about their disciplinary record in order to show possible bias); *United States v. Bright,* 588 F.2d 504 (5th Cir. 1979) (character witness for a defendant lawyer may be cross-examined about disciplinary action against the lawyer). Thus, we think that the discretionary right given to the trial judge by FRE 608(b) includes the right to permit a defendant, who is a lawyer, testifying in his own behalf to be cross-examined about the basis for a suspension order as well as the proceedings themselves.

■ Conversely, if such a witness either admits or denies the suspension, we do not think that the documents relating to it are admissible. FRE 608(b) quite clearly states that specific instances of conduct for the purpose of attacking or supporting the credibility of a witness "may not be proved by extrinsic evidence." The anticipatory ruling of the district court that the suspension document was admissible was erroneous. The error, however, was harmless. Whitehead nowhere stated or even suggested that he was willing to testify even if he

could be cross-examined about the suspension, so long as the suspension document was excluded. Thus, we must read the record to show that Whitehead declined to testify, at least in part, because he could be cross-examined about the suspension; and this, we have concluded, is not in the eyes of the law a valid reason. A further declination for a legally valid reason adds nothing to the case.

### III. *Other Assignments of Error*

■ Appellants allege that the district court erred in permitting the government, in its direct examination of Dowdy, Boyd and Barker, to elicit the fact of their guilty pleas to the charges at issue in the case. The district court based its decision on the established rule that, where the defense plans to impeach witnesses by establishing that their testimony is pursuant to a plea agreement, the government may introduce this evidence in its case in chief. *E. g., United States v. Curry,* 512 F.2d 1299 (4th Cir. 1975). Appellants contend that the rule is inapplicable in this case because they agreed to limit their impeachment questioning to the fact that the witnesses were presently awaiting sentencing for an unspecified offense and were testifying in hopes of leniency.[11] We agree with the district court that such a limitation on the details of the plea agreements would have been both unfair to the witnesses and misleading to the jury.

The prosecution's inquiry into the guilty pleas during its examination was limited to a brief question as to whether the witnesses had entered pleas of guilty to "charges in this case." On each occasion, the district court immediately instructed the jury, in the language approved in *Curry,* that the pleas could not be considered as evidence

---

11. Appellant Henderson, alone, offered to forego any reference to the witnesses' plea agreements. He now contends that, because of his co-defendant's refusal to make the same concession, he was denied his right to avoid any introduction of the pleas into evidence. He argues that this fact, and the unusual publicity the case attracted because of Whitehead's status, make the district court's refusal to grant him a severance prejudicial error. We see no merit to this argument. A difference in trial strategy among co-defendants is not a sufficient basis to require severance, absent some showing of unusual prejudice, which Henderson has failed to make. *E. g., United States v. Becker,* 585 F.2d 703 (4th Cir. 1978). Henderson has also failed to show any prejudice resulting from the publicity given the trial.

against appellants. Under these circumstances, we see no error in the admission of the guilty pleas.

Appellants also assign error to the district court's quashing of a subpoena, directed at a special state grand jury which was still in progress, seeking the testimony of Dowdy and Boyd in hopes of discovering statements inconsistent with their trial testimony. The district court, noting that Virginia law prohibited disclosure of the testimony for any purpose other than a perjury prosecution, ruled that the state's interest in secrecy of the ongoing investigation outweighed any need for additional impeachment material shown by appellants. We believe that the district court's ruling was correct. Appellants had available a wealth of material, including a prior inconsistent statement by Boyd before a federal grand jury, with which to impeach the government's witnesses. Even assuming that the district court had the authority to direct disclosure of state grand jury documents, *see United States v. Penrod*, 609 F.2d 1092, n.8 (4th Cir. 1979), we do not believe that appellants demonstrated a need for the testimony sufficient to justify invasion into the state body's proceedings.

We have carefully considered appellants' other assignments of error, and find them without merit. We are convinced that appellants were afforded a fair trial and that the evidence amply supports their convictions.

Accordingly, the judgments of conviction are affirmed.

*AFFIRMED.*