688 F.2d 941
 11 Fed. R. Evid. Serv. 954
 UNITED STATES of America, Appellee,
v.
Willard Raymond WOOTEN, Appellant,
National Association of Criminal Defense Lawyers, Amicus Curiae.
UNITED STATES of America, Appellee,
v.
Donald James HUNT, a/k/a Danny Hunt, Appellant.
UNITED STATES of America, Appellee,
v.
Ralph JUSTIZ, Appellant.
 Nos. 81-5266 to 81-5268.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 1, 1982.
Decided Sept. 3, 1982.
Rehearing and Rehearing En Banc Denied Nov. 2, 1982.
 
 Alan E. Weinstein, Miami Beach, Fla. (Richard J. Preira, Miami Beach, Fla., on brief), for appellant Willard Raymond Wooten.
 Robert W. Johnson, Wilmington, N. C., on brief, for appellant Donald James Hunt.
 Donald James Hunt, pro se on brief.
 Melvyn Kessler, Miami, Fla., on brief, for appellant Ralph Justiz.
 Sara Criscitelli, Dept. of Justice, Washington, D. C. (Samuel T. Currin, U. S. Atty., Raleigh, N. C., on brief), for appellee.
 Murray Janus, Richmond, Va., Alan Ellis, Philadelphia, Pa., and Joseph Beeler, Miami, Fla., on brief, for amicus curiae The Nat. Ass'n of Crim. Defense Lawyers, Inc.
 Before RUSSELL, WIDENER and CHAPMAN, Circuit Judges.
 DONALD RUSSELL, Circuit Judge:
 
 
 1
 The defendants-appellants, Willard Raymond Wooten, Donald James Hunt, and Ralph Justiz, along with a number of others not involved in this appeal,[1] were indicted for conspiracy to import, for importation of, and for possession with intent to distribute marijuana.[2] After a trial, all three defendants were convicted of importation of marijuana, defendants Hunt and Justiz were additionally convicted of possession with intent to distribute, and the defendant Justiz was further convicted of conspiracy to import and distribute marijuana. Following sentencing, all appealed their convictions, charging a number of alleged errors. We affirm.
 
 
 2
 * This prosecution arose out of a scheme to import a large amount of marijuana from Colombia, South America, into eastern United States for distribution. The primary promoters of the scheme appeared to have been the defendants Justiz and Rego,[3] both residents of Miami, Florida. Under the plan the marijuana was to be transported by a freighter from Colombia to a point off the coast of North Carolina, where it would be offloaded onto smaller boats for transportation ashore to a pier at Southport, North Carolina. Justiz and Rego undertook to survey by boat the coast off Southport and to locate a rendezvous area where the freighter which was bringing the marijuana from Colombia could meet the smaller boats which were to carry the marijuana ashore. While so engaged their boat became disabled and they were stranded about 40 miles off the coast. Lane and Perry, two operators of fishing boats based at Southport, were fishing and came upon Justiz and Rego in their disabled boat. They towed Justiz and Rego ashore and were paid $1,000 for such services. Justiz and Rego wished to return to Florida and engaged Lane and Perry to repair their boat and to return it to them in Florida.
 
 
 3
 When the boat was repaired Lane delivered it to Justiz and Rego in Florida. At that time, Justiz and Rego disclosed to Lane their scheme and solicited his assistance in North Carolina. Later Justiz flew to Wilmington, North Carolina, and met with Lane. Arrangements were then made for Lane's participation in the scheme. Lane received $10,000 at the time as a down payment on the $500,000 ultimately to be paid him as his share from the venture. Under the arrangement Lane was to provide the crews and have the responsibility for the operation of the crafts to be used in taking the marijuana from the freighter ashore. The crafts to be used by Lane and his crew were to be furnished by Rego. The crafts furnished by Rego, however, were found to be unsatisfactory and Lane enlisted the assistance of Perry and Todd, neither of whom was named in the indictment as defendants, but both of whom, along with Lane, were identified as co-conspirators. Perry was the owner of a fishing craft, the Ox, as well as the owner of the American Fish Company, which maintained a fish warehouse and dock at Southport. Todd was the captain of another boat, the Southern Pride. It was arranged that both the Southern Pride and the Ox would be used to bring the marijuana ashore, which would be stored temporarily in the fish warehouse of the American Fish Company until it could be trucked out for distribution.
 
 
 4
 By February 20 the freighter Jell II had reached the agreed rendezvous point with its cargo of marijuana and Justiz, Rego and Hunt, another defendant from Florida originally introduced to Lane only as "Danny" had arrived at Southport to supervise operations. The Southern Pride, with Todd and the defendant Hunt in charge was dispatched out to the Jell II and, after taking on board 80 bales of marijuana from the Jell II, returned to the shore. Hunt, Lane and Lane's friends and brothers, whom Lane had recruited for the purpose, unloaded the marijuana and stored it in the fish warehouse. Hunt left the scene for a short time and then returned with a truck which he had rented. The marijuana was loaded on the truck and Hunt drove the truck away.
 
 
 5
 Sometime between February 20 and February 24, a United States Customs Service plane, maintaining a surveillance of the coastal area for any suspicious activity at sea, had located the Jell II. The pilot of the plane circled the freighter and noted that, while it was moving about in an unusual way, it carefully stayed within the same general area. There was no reason why the crew on the Jell II should not have known of this surveillance but, if they did, they did not inform the conspirators on the shore of the fact.
 
 
 6
 On February 24 Lane, his brother Stephen Brock and another friend took the Southern Pride and the Ox out to the Jell II. The transfer of marijuana from the freighter to the two smaller crafts began. Marijuana was first loaded on the Southern Pride, which set off for shore with Lane's brother and the friend on board. Lane and Brock who were in control of the Ox, then turned to loading, with the assistance of the freighter's crew, the Ox. After the Ox was loaded, the person who had identified himself as the captain of the Jell II, the defendant Wooten, jumped aboard the Ox and rode back to Southport with Lane and Brock on the Ox. Wooten talked to Lane on this trip in. He first confided that he had "broken his ribs and he wanted to ride in with me (Lane)." He added that there was no water or food aboard the Jell II and asked for water. Later, he said he had sought to communicate with "Gene" (identified as the co-defendant Littrell, whose case, along with that of the defendant Rego, was severed for separate trial, but who is identified in the indictment as the conspirator who maintained radio contact with the freighter) "because he did not like the way whoever was handling this thing" was handling it and wanted "Gene" to "become involved with it." His dissatisfaction was apparently directed at his Cuban crew, whom he suspected of "trying to pull some kind of a rip-off or something." He sought to disassociate himself from the Cubans and told Lane "to chuck the pot overboard and go tell 'his people,' as he described it, what was going on, and they would give me my money that I was supposed to get paid." He told Lane that he (Wooten) was to be paid or had been "paid" $400,000 "for being the captain of the Jell II," in bringing the marijuana from South America. Brock, also, had some conversation on the trip in with Wooten about the latter's involvement with the marijuana. Particularly, Brock inquired how Wooten got the marijuana from South America to the rendezvous area. Wooten replied that he "snuck it out of South America the same way you sneak it up here."
 
 
 7
 When the Ox arrived at the American Fish Company landing dock, several of the co-conspirators, including Justiz and Rego, were present at the dock. Immediately, Wooten jumped off the Ox and was observed talking to Rego. After a short conversation, Rego and Wooten got into a car and left. Lane and others began to unload the Ox. Hunt assisted. Hunt, however, did not remain for the complete unloading, commenting that he was going to his motel but would return as soon as the unloading was completed. When Lane and the others finished unloading the Ox and had stored the marijuana in the fish warehouse, they began to unload the Southern Pride. It was at this time that the Customs Patrol and the Drug Enforcement Administration (DEA) officers boarded the boats and made arrests of those present. The defendants were later apprehended, indicted, tried and convicted. They appeal their convictions.
 
 II
 
 8
 The defendants have asserted many assignments of error. Some of them relate to the appeal of but one defendant, others are raised by all the appellants. The defendant Wooten raises the sufficiency of the evidence to convict him of the single charge of importation of marijuana. To some extent he would base this phase of his argument upon the failure of the jury to convict him of either conspiracy or of possession with intent to distribute. Inconsistency of verdicts, however, is not an appropriate basis for reversal of an otherwise valid jury verdict. Hamling v. United States, 418 U.S. 87, 101, 94 S.Ct. 2887, 2899, 41 L.Ed.2d 590 (1974); United States v. Scheper, 520 F.2d 1355, 1358 (4th Cir. 1975); United States v. McCloud, 427 F.2d 242, 243 (4th Cir.), cert. denied, 400 U.S. 910, 91 S.Ct. 155, 27 L.Ed.2d 150 (1970); United States v. Grow, 394 F.2d 182, 208 (4th Cir.), cert. denied, 393 U.S. 840, 89 S.Ct. 118, 21 L.Ed.2d 111 (1968). The evidence of Wooten's participation in the importation of the marijuana-the crime of which he was convicted-is overwhelming and the jury verdict convicting Wooten of importation was abundantly sustained by the evidence. Wooten himself admitted to Lane and Brock that he had captained the boat which had brought the marijuana from Colombia to the rendezvous point off the coast of North Carolina and either had been paid or was to be paid $400,000 for such services. Presumably he was present on the freighter when 80 tons of marijuana were transferred from the freighter to the Southern Pride for transportation ashore on February 20, and must have had some part in the transfer of the 80 tons of marijuana to the smaller crafts for importation into the United States. In the face of this evidence, the suggestion by the defendant that, though he was captain of a ship that took on a full cargo of marijuana in Colombia, had brought that cargo to a point off Southport, North Carolina, and had delivered 80 tons of marijuana to be smuggled ashore, he had not known that his cargo was marijuana, is incredible. The jury had a right to accept Wooten's own statements to Lane and Brock about his involvement in the importation and to convict him of importation.[4]III
 
 
 9
 Similarly raising the issue of sufficiency of the evidence, the defendant Hunt takes the position that there was no evidence of his involvement in the importation or possession covered by counts 2 and 3 of the indictment, the only counts of which he was convicted. He asks that his convictions under counts 2 and 3 be voided. Unfortunately for his claim, there is sufficient evidence of Hunt's presence at and participation in the importation to support his conviction under counts 2 and 3. Lane clearly identified him as present and participating in connection with the importation of the 80 tons of marijuana on February 20. He was the one who took the marijuana from the dock into a truck for later distribution. Again, he was present on the 24th and participated in the unloading on that occasion. This was adequate to warrant submission of his participation to the jury under both counts 2 and 3. The jury resolved the issue against the defendant Hunt and that resolution is conclusive on this appeal.
 
 IV
 
 10
 Wooten has raised another claim peculiar to him which is relevant only to the conspiracy count, a count on which he was acquitted. He would find error in the failure of the district judge to instruct the jury properly on his defense of abandonment or withdrawal from the conspiracy. He submitted a requested instruction which he asserts correctly sets forth the legal rule on withdrawal and he contends the district court committed reversible error in failing to charge as requested. As amended, Wooten's requested instruction was to the effect that, if the Government had proved "beyond a reasonable doubt that (he) was a member of the charged conspiracy, (but) if the evidence shows that the defendant Wooten abandoned or withdrew from the conspiracy, you should find him not guilty." The instruction also, included a statement of the burden of proof required for the defense of a withdrawal or abandonment: "affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators." To establish a basis for such an instruction, Wooten relied on that portion of the testimony of Lane and Brock which dealt with Wooten's action in jumping on the Ox as it was leaving the freighter and his conduct and actions while traveling on the Ox to the shore.
 
 
 11
 There is no question that the district judge did not give the instruction on withdrawal as requested by Wooten, nor is it seriously argued that the requested instruction was not a correct instruction on the defense of withdrawal by an alleged conspirator, to be given provided there is a factual basis for the defense. But it is by no means clear that the record provided a factual basis for the instruction. Wooten's statements on the 24th, as made to Lane and Brock, did not constitute a repudiation of the venture or of his involvement in it. He seemingly did have strong objections to the conduct of "the Cubans" in his crew and he had attempted to reach by radio his co-defendant Littrell, to whom he apparently reported, to complain of their actions. But to complain of the conduct of the Cuban crew was not an action inconsistent with one's continued participation in the criminal undertaking and this is particularly so in this case, since Wooten was seeking direction from Littrell, who was one of the important figures in the undertaking. Even when he suggested to Lane on the Ox that the latter throw "the pot" they were transporting to the shore overboard, he said that "his (Wooten's) people" would pay Lane his agreed compensation for participation in the conspiracy. And when the Ox docked, he rushed to join Rego, who, along with Justiz, was the leader in the venture, and rode off with him. None of this would support an inference that Wooten had abandoned by any affirmative action the conspiracy and he certainly had not "communicated (such withdrawal) in a manner reasonably calculated to reach co-conspirators," an act which is declared in United States v. United States Gypsum Co., 438 U.S. 422, 464, 98 S.Ct. 2864, 2887, 57 L.Ed.2d 854 (1978), to be an essential element of the defense.[5] Moreover, whether he sought to withdraw on the 24th or not could not erase his earlier participation in the conspiracy in bringing the marijuana from South America to the rendezvous point off the North Carolina coast, nor immunize him from responsibility as a co-conspirator for his actions in pursuance of the conspiracy prior to the 24th. United States v. Read, 658 F.2d 1225, 1232-33 (7th Cir. 1981). Finally, even had the failure to instruct as requested been error such error would have been harmless, since Wooten was acquitted by the jury under the conspiracy charge.
 
 V
 
 12
 The defendants next charge prejudice arising from prosecutorial misconduct. Two circumstances are cited in support of this claim. First, it is asserted that the prosecutor, by a remark made at the outset of trial, violated the constitutional prohibition against any comment upon either the duty or the failure of the defendants to testify or offer evidence in their defense. This comment occurred after counsel for the defendants had begun to "read from this paper ... that Willard Wooten came in off the ship." At that point, counsel for the Government interrupted by objecting apparently to the defendants' counsel's reading from a deposition and asking that the latter restrict his opening statement to the jury by "stat(ing) what the defense evidence is going to be." The defendants objected to this statement at first as leading. Later at a bench conference, the defendants' counsel raised the contention that the statement of Government's counsel was a comment, albeit indirect, on the defendants' possible failure to testify and of a duty on the part of the defendants to present evidence in their defense. The district judge sustained the objection and instructed the jury that "the defendant in a criminal case doesn't have any burden of producing a witness or taking the stand, or giving any evidence at all."
 
 
 13
 The statement which the defendants contend was an improper comment on the defendants' burden of proof and duty to testify was at best most indirect. It is not important, however, for the decision of this case that we determine whether the statement was improper or not. The applicable rule in determining whether an indirect and ambiguous comment such as that of the prosecutor in this case was so improper as to require a new trial was recently declared by us in United States v. Whitehead, 618 F.2d 523, 527 (4th Cir. 1980):
 
 
 14
 "The test for determining whether an indirect remark constitutes improper comment on a defendant's failure to testify (or, we may interpolate, the defendant's failure to offer proof) is: 'Was the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify' (or to offer evidence in his defense)."[6]
 
 
 15
 Applying that rule, it is manifest that the comment of the prosecutor in this case was not "manifestly intended to be" or was "of such character that the jury would naturally and necessarily take it to be a comment" on the defendants' failure to offer any proof in their defense but, even if it did, " 'the judge's instructions were sufficient to cure that impression.' "[7]
 
 
 16
 The second charge of prosecutorial misconduct arises out of a question addressed by the prosecutor to the witness Lane, during his testimony in describing the events on February 24 when the defendant Wooten jumped onto the Ox as it was pulling off from the freighter. This was the incident on which Wooten grounded his withdrawal claim. In addressing that claim through the testimony of Lane, the prosecutor sought to develop minutely all the circumstances surrounding Wooten's actions, conduct and conversation during that incident. Lane was thus asked to describe Wooten's condition at the time, including his dress as well as any articles he might have had. He identified the defendant's attire as an orange jump suit. He was then asked if he had with him "any substance identified as cocaine, while coming in?" Objection was entered by the defendants and, after some discussion at the bench, the question was withdrawn. This question represented, according to Wooten, the injection into the case of the additional charge of an illegal importation of cocaine in violation of Rule 404(b), Federal Rules of Evidence. Rule 404(b), however, only excludes evidence of other crimes offered to prove bad character. Proof of other crimes, if relevant for some other purpose, may be admitted, if the trial court does not find that its relevancy is overbalanced by its prejudicial aspect. See, United States v. Masters, 622 F.2d 83, 85-87 (4th Cir. 1980); United States v. Hadaway, 681 F.2d 214, (4th Cir. 1982); United States v. Calvert, 523 F.2d 895, 906-07 (8th Cir. 1975), cert. denied 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976); 22 Wright & Graham, Federal Practice and Procedure, § 5239, p. 441 (1978). One of the recognized grounds for accepting proof of other crimes is what has been variously described as the "complete story principle" or a part of the "res gestae," McCormick on Evidence, § 190, p. 448 (Cleary Ed.). Under this "complete story principle," the witness may testify to all the circumstances relating to the charged crime or the defendant's asserted defense to the charge.
 
 
 17
 The fact that Wooten had cocaine with him (if he actually did) was a part of the "complete story" of the events in connection with which Wooten claimed he manifested an intent to withdraw from the criminal scheme of importation. And a question on the part of the prosecutor with respect to such fact (if it was a fact) was not injected into the case without any basis in fact and for purposes of prejudice. In the colloquy between counsel for the defendant and the Court, during a hearing in chambers on this question, the day before, it was stated that Lane had testified without objection that Wooten had cocaine with him when he came aboard the Ox. The prosecutor seems in his examination to have been following in his questioning the course of testimony in the earlier hearing. While this circumstance would not render the question proper at the trial, it certainly can provide an explanation of the prosecutor's action in asking the question and answers any claim of bad faith on the prosecutor's part. The question, however, was never answered and, after the defendant objected, was not repeated. Even if the question might be considered improper, any error was harmless in the light of the evidence of the defendant Wooten's overwhelming guilt, as represented in his own declaration that he had brought the marijuana from South America and was being paid for such services.
 
 VI
 
 18
 The most seriously argued claim of error raised by the defendants rests on the district court's denial of a continuance. One of the grounds for such claimed error is the alleged failure of the government to comply with an order of discovery, which failure, the defendants contend, so prejudiced them in preparing for trial that a continuance was mandated. Such ground is without merit. In large part the material not disclosed by the Government consisted of exhibits introduced in a related trial involving other participants in the conspiracy, United States v. Brock.[8] These exhibits were in the custody of the clerk and were as available to the defendants as to the Government. The failure of the defendants to obtain copies of such exhibits until the day of trial was due to a want of diligence on the part of the defendants and their counsel, who knew for some days before trial of the location of the exhibits. The arrest records of, and statements of any inducements or promises made to, any Government witness-another item which the defendants argue was tardily disclosed-were ordered given the defendants by an order of the Magistrate, to whom the matter had been referred by the district judge, entered on September 14. That order was appealed by the Government. However, without pressing the appeal, the Government on the day of trial produced this material. Such production represented valid compliance with defendants' Giglio rights;[9] there is no obligation ordinarily to furnish this material prior to trial. Moreover, the defendants had made no showing of any prejudice suffered by them as a result of any delay in production.
 
 
 19
 Finally, the defendants complain that the Government was also tardy in supplying them with fingerprint evidence involving the defendants Wooten and Hunt. At an early hearing, counsel for the Government had told the attorneys for the defendants that he had no fingerprint evidence to offer. About a week before trial, he was advised that fingerprint evidence had been discovered by the investigating agents. Counsel for the Government promptly advised the attorneys for the defendants of this fact and offered to make copies of such evidence available to counsel for the defendants. However, due to delays in postal deliveries, counsel for the defendant Wooten, whose office was in Miami, Florida, may not have received copies of such fingerprints until the day of trial, though his local counsel may have had access to the copies. The defendants could not, though, have been prejudiced by the delay. The fingerprints of Wooten were taken from the Ox. The most that could be claimed from such fingerprints was that they demonstrated that Wooten had been on the Ox. That fact is not disputed in the record. In fact, his presence on the Ox was necessarily admitted as a part of his withdrawal defense. Similarly, the fingerprints of the defendant Hunt were taken off a truck used to transport the marijuana. There is no controversy over the fact that Hunt had leased the truck sometime before the truck was used to haul the marijuana. The fingerprints merely confirmed this undisputed fact. The district court found, after a hearing, that it was unable to find on the evidence that the Government had "failed to act with reasonable diligence in obtaining the information or that it has not acted in good faith," and accordingly denied the motion of the defendants to suppress the fingerprint evidence. Again, even if this ruling were erroneous, it was manifestly harmless.
 
 
 20
 In denying a continuance on the three grounds discussed above, the district court did not commit an abuse of discretion.
 
 VII
 
 21
 The defendants do, though, raise a statutory ground for continuance. They contend-and this is the main burden of their appeal-that the mandatory minimum period of 30 days between "the date on which the defendant first appears through counsel or expressly waives counsel and elects to proceed pro se" and the date of trial, as fixed by the Speedy Trial Act, § 3161(c)(2), 18 U.S.C., is extended by the periods of excludable delay "in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence," as provided in Section 3161(h) of the Act. Section 3161(c)(2) in the Speedy Trial Act, however, does not provide for an extension of the 30-day minimum time period between the defendant's appearance with counsel and trial either expressly or by incorporation by reference of Section 3161(h). The sole limitation placed by section 3161(c)(2) on the right of the Government to proceed to trial is that the trial "shall not commence less than thirty days from the date on which the defendant first appears through counsel or expressly waives counsel and elects to proceed pro se." There is no language in section 3161(h), which suggests even remotely that its exclusion provisions have any reference to or connection with the time limits fixed by section 3161(c)(2). That section, 3161(h), with its time exclusions, by its express language is to be looked to only "in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence." Nor can it be argued with any force that Congress' failure to incorporate the exclusionary provisions of section 3161(h) in the terms of section 3161(c)(2) was inadvertent rather than intentional. In drafting other sections, where Congress did intend to incorporate by reference the exclusionary provisions of (h), it said so in clear and unmistakable language. Thus, in section 3161(d)(2), Congress explicitly declared: "The periods of delay enunciated in section 3161(h) are excluded in computing the time limitations specified in this section." Such inclusion of the exclusions of (h) in other sections of the Act and its omission in 3161(c)(2) would seem to be conclusive that Congress did not intend the exclusions in section (h) to apply to section (c)(2), see Lankford v. Law Enforcement Assistance Admn., 620 F.2d 35, 36 (4th Cir. 1980); United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir. 1972), for as Justice O'Connor said in her dissenting opinion in FBI v. Abramson, --- U.S. ----, 102 S.Ct. 2054, 72 L.Ed.2d 376 (1982), "a judge must presume that Congress chose its words with as much care as the judge himself brings to bear on the task of statutory interpretation." In summary, if the plain and unambiguous language of the statute itself is accepted as the primary canon of statutory construction, see United States v. Turkette, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981), there can be no question that the only prohibition imposed by the Speedy Trial Act itself on the commencement of the criminal trial is the thirty-day limitation established by section 3161(c)(2).
 
 
 22
 It is the argument of the defendants that, while the plain language of the pertinent section does not incorporate section (h) of the Act by way of modification, the legislative history indicates that it was the legislative intent to include section (h) as an integral part of section (c)(2) and that this court should accordingly write into section (c)(2) the language used by the Congress in section (e) which did incorporate by express reference section (h). The alleged basis for this argument is certain language in the Senate Report on the 1979 Amendments to the Act, included among such amendments being (c)(2). Such language was:
 
 
 23
 "Prohibiting trial less than 30 days after the defendant appears in a position to begin preparing his defense more fully protects basic due process rights. It is the Committee's intent that the exclusions provided in section 3161(h) apply to the 30-day minimum to trial provision. Therefore, if an event occurs which would automatically exclude time under 3161(h), such as a pretrial mental examination, that that is not only excluded from computing the time within which the trial must occur prior to imposition of the dismissal sanctions, but time would also automatically be excluded in computing the 30-day minimum period of time, during which the judge could not schedule trial without the defendant's consent." Sen.Rep. 96-212, 96 Cong., 1st Sess. (1979), p. 32.
 
 
 24
 The House Report on the amendments, however, had no similar comment; and there is no Conference Report. It has been aptly remarked that the report of one House " 'does not go very far to show the intention of a majority of both houses of Congress.' " Davidson v. Gardner, 370 F.2d 803, 828 (6th Cir. 1967). Particularly is this so when the language of the statute itself is as unmistakably clear as it is in this case. Under the circumstances, we agree with the opinion of the Committee on the Administration of the Criminal Law of the Judicial Conference of the United States, as stated in its published "Guidelines to the Administration of the Speedy Trial Act of 1974, as Amended:"
 
 
 25
 "In spite of language to the contrary ..., it is the view of this Committee that the thirty-day minimum period for commencement of trial is not extended by the exclusions of Section 3161(h). ... Moreover, if the thirty-day minimum were interpreted as subject to the exclusions, the provision would become a powerful weapon for defendants who wanted to delay their prosecutions, a result that is wholly at odds with the major purpose of the statute. Under such an interpretation, the court could be compelled to defer a trial simply because the defendant filed a motion or because the court took a pretrial matter under advisement-both events that trigger periods of excludable time under Section 3161(h)(1)."
 
 
 26
 Finally, the defendants argue that the construction placed by us on (c)(2) would place the defendants at an unfair disadvantage. This contention is predicated on the assumption that (c)(2) both protects the defendants from being forced to go to trial before the lapse of 30 days from arraignment and engagement of counsel and denies to the trial court any right to continue on motion of the defendant the case for trial beyond the 30-day period. The assumption is fallacious. There is nothing in the section which forecloses the granting of a continuance beyond the 30-day period by the district court on any appropriate ground. If the trial court has ordered a competency hearing, for instance, and the hearing cannot be concluded within the 30-day period, it would undoubtedly be an abuse of discretion and perhaps a violation of due process for the trial court not to grant a reasonable continuance after the competency issue was resolved. What section 3161(c)(2) does is simply to guarantee to the criminal defendant the right to a delay of at least 30 days between arraignment and trial in any circumstances. This guarantee is in addition to or supplementary to any other rights that the defendant may have under recognized legal principles for a continuance beyond those thirty days as given him by § 3161(c)(2). What the statute does not give the criminal defendant is the right, by filing dilatory motions, to extend on his own the date of his trial. The power to extend the time of trial beyond the thirty-day period lies with the trial judge in the exercise of his informed discretion exercised in keeping with established principles of fairness and justice. By so construing the statute we give to its language its accepted meaning and achieve the purposes and intentions of Congress in the statute's enactment.
 
 
 27
 Finding no prejudicial error in the trial of the defendants, we accordingly affirm the judgments of conviction of the defendants.
 
 AFFIRMED.[10]
 
 
 [1]
 The others indicted were Eddy Alvino Rego; Eugene Herbert Littrell; Ramiro Grau; Miquel Angel Ramiraz; Charles Martin Moorman. Not named in the indictment as defendants but named as co-conspirators were: Cleveland Adair Lane; Adrian Theodore Lane; Michael Frederick Lane; Stephen Talmadge Brock, Jr.; Joseph Calvin Gioialli; Claude David Cook; Paul Pudgen; Charles Hewett Perry; and Rick Todd
 
 
 [2]
 In violation of 21 U.S.C. §§ 963, 952(a), 960(a)(1), 841(a)(1)
 
 
 [3]
 The case against Rego was severed for trial and is not involved in this appeal
 
 
 [4]
 Wooten has, however, cited United States v. DeSimone, 660 F.2d 532 (5th Cir. 1981), in support of his claim of insufficiency of evidence. In that case the evidence connecting the defendant DeSimone with the marijuana importation conspiracy was thus summarized by the court (p. 537):
 "In this case, we are confronted with the combined circumstances of DeSimone's association with his co-defendants at various times over a period of several days and his attempted flight in the middle of the night from an automobile which was ditched near the Greensboro airport, a remote area."
 That is a far cry from this case where the undisputed evidence from the defendant's own mouth is that he had brought the marijuana from South America. With this evidence in the record, it seems frivolous for the defendant to argue a claim of insufficiency of evidence against a guilty verdict of importation.
 
 
 [5]
 The authoritative statement of the elements of a withdrawal or abandonment defense is set forth in United States v. United States Gypsum Co., 438 U.S. at 464-65, 98 S.Ct. at 2887:
 "Affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal or abandonment."
 See, also, United States v. Battista, 646 F.2d 237, 246 (6th Cir. 1981), cert. denied, 454 U.S. 1046, 102 S.Ct. 586, 70 L.Ed.2d 488 (1981); United States v. Nowak, 448 F.2d 134, 139 (7th Cir. 1971).
 
 
 [6]
 See also, United States v. Anderson, 481 F.2d 685, 701 (4th Cir. 1973), aff'd., 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 21 (1974)
 
 
 [7]
 618 F.2d at 528
 
 
 [8]
 Convictions affirmed, 660 F.2d 106 (4th Cir. 1981)
 
 
 [9]
 Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)
 
 
 [10]
 The National Association of Criminal Defense Lawyers, Inc. sought and was granted the right to file an amicus brief in support of the defendants' claim under the Speedy Trial Act. Some weeks after filing its brief, amicus requested by motion leave to file a supplemental brief, which was substantially a reiteration of its earlier brief, and leave for supplemental oral argument. That motion is denied