953 F.2d 640
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Donald EXCELL, Defendant-Appellant.
 No. 91-5036.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 6, 1991.
Decided Jan. 16, 1992.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore, No. CR-90-155-K, Herbert N. Maletz, Senior District Judge.
 Argued: Atiq Rahman Ahmed, Silver Spring, Md., for appellant; James G. Warwick, Assistant United States Attorney, Baltimore, Md., for appellee.
 On Brief: Richard D. Bennett, United States Attorney, Baltimore, Md., for appellee.
 D.Md.
 AFFIRMED.
 Before ERVIN, Chief Judge, and DONALD RUSSELL and WILKINSON, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Defendant Donald Excell was convicted in the District of Maryland of both conspiracy and substantive counts relating to a scheme to bribe a customs agent and import marijuana from Jamaica. Excell timely appealed his conviction, claiming insufficient evidence for each count and district court error in two evidentiary rulings. We affirm in all respects.
 
 
 2
 * In August 1989, Donovan Hutchinson solicited a United States Customs Inspector, Andre Henry, to allow a shipment of marijuana into the United States. Henry immediately reported the contact to the Internal Affairs Unit of the Customs Service, which commenced an investigation. Hutchinson, his partner Lloyd George Dyer, Inspector Henry, and United States Customs Service Special Agent John Paletti, posing as a corrupt customs inspector, met twice in Philadelphia to plan the importation. During the first meeting, on September 7, 1989, Paletti outlined how he would allow the marijuana to pass into the United States, and the parties agreed that Paletti would receive $1,000 immediately and $4,000 when the drugs cleared customs. During the second meeting, Hutchinson and Dyer gave Paletti a $950 advance payment and agreed to obtain the marijuana shipment from the Commonwealth of Jamaica and have it transported into the Port of Baltimore.
 
 
 3
 Hutchinson and Dyer travelled to Jamaica in the fall of 1989 but were unable to obtain a shipment because of lack of money and local contacts. In November 1989, Hutchinson introduced Dyer to defendant Donald Excell at Excell's apartment in Brooklyn, New York. Excell professed to have Jamaican contacts. Hutchinson also introduced Inspector Henry to Excell by telephone later that month. Excell asked Henry about his control over Baltimore customs and the quantities that could be imported, and Excell agreed to pay Paletti $4,000 on delivery.
 
 
 4
 On February 27, 1990, Hutchinson informed Henry that Excell had arranged to ship 600 pounds of marijuana to Baltimore. After delays, 485 pounds of marijuana in ten boxes arrived on March 24 on an Air Jamaica flight. Excell and Hutchinson spoke with Henry that day to make sure that the marijuana arrived. Another box of marijuana arrived from Trinidad, bearing the same addressee as the Jamaica boxes.
 
 
 5
 Dyer and another man drove from New York to pick up the shipment, planning to drop off half of the marijuana in Philadelphia with Excell. They were arrested immediately after paying Agent Paletti $5,000 in cash. Dyer agreed to cooperate with the government and provided the information that led to Excell's arrest in Brooklyn. Agents searched Excell's apartment and found Hutchinson's home phone and beeper numbers. The police audiotaped an interview with Excell to play to Inspector Henry so they could be certain that Excell was the "Donald" who was part of the plot. Henry confirmed the identification.
 
 
 6
 On August 2, 1990, the Grand Jury in the District of Maryland, at Baltimore, charged Excell with various conspiracy and substantive offenses related to these events. Excell entered a plea of not guilty to the charges and filed a motion to suppress the physical evidence and identification testimony. An evidentiary hearing was held on October 26, 1990, before Frank A. Kaufman, Senior District Judge. The court denied the motions to suppress[1] and the case was transferred to Herbert N. Maletz, Senior District Judge, for trial. A six day trial was held from December 11, 1990 to December 18, 1990. The jury returned a guilty verdict on all charges. Judge Maletz sentenced Excell on April 23, 1991 to seventy months of incarceration on four counts and sixty months on one count, all sentences to run concurrently. Excell timely appealed from his convictions.
 
 II
 
 7
 At the conclusion of the government's evidence and again at the close of all the evidence, Excell moved for a judgment of acquittal pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure with respect to all of his charges. The district court denied these motions, and Excell appeals. The appropriate standard of appellate review as set forth by this court is as follows:
 
 
 8
 The guidelines for reviewing the sufficiency of evidence to support a conviction are quite familiar. The relevant question is not whether the appellate court is convinced of guilt beyond a reasonable doubt, but rather whether, viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt. We must consider circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established.
 
 
 9
 United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir.1982) (citations omitted), cited in United States v. MacDougall, 790 F.2d 1135, 1151 (4th Cir.1986), and United States v. Jones, 735 F.2d 785, 791 (4th Cir.), cert. denied, 469 U.S. 918 (1984). We will divide our discussion into the three conspiracy charges and the two substantive offenses.
 
 
 10
 * Excell was charged under Count I with the crime of conspiracy to bribe a public official (18 U.S.C. § 371), under Count III with conspiracy to possess with the intent to distribute marijuana (21 U.S.C. § 846), and under Count V with conspiracy to import marijuana (21 U.S.C. § 963).
 
 
 11
 To convict Excell of conspiracy to commit a particular crime, the government must first show that a conspiracy to commit the crime existed. A conspiracy is the agreement between two or more individuals to commit a criminal act. This agreement may be inferred from the facts and circumstances of the case. The government must also show Excell's knowledge of the conspiracy's purpose and some voluntary and intentional action indicating his participation. These elements, knowledge and participation, may also be proven by circumstantial evidence. United States v. Laughman, 618 F.2d 1067, 1074-75 (4th Cir.), cert. denied, 447 U.S. 925 (1980); see also United States v. Manbeck, 744 F.2d 360 (4th Cir.1984), cert. denied, 469 U.S. 1217 (1985). The jury must have been warranted, viewing the evidence in the light most favorable to the government, in finding beyond a reasonable doubt that with respect to each crime a conspiracy existed, that Excell knew of it, and that he voluntarily became a part of it. United States v. Dominguez, 604 F.2d 304, 310 (4th Cir.1979), cert. denied, 444 U.S. 1014 (1980).
 
 
 12
 There was clearly a conspiracy to bribe a public official, Inspector Henry, for the purpose of importing marijuana. Hutchinson and Dyer had an explicit plan in which they agreed to bribe Inspector Henry to allow marijuana to clear customs. This conspiracy involved numerous overt acts. Hutchinson and Dyer had two meetings with Henry in Philadelphia and they spoke with Henry forty-eight times concerning his supposed corrupt colleague Paletti's ability to allow the importation of marijuana into the United States. Hutchinson and Dyer paid Henry $950 up front and paid Paletti $5,000 when Dyer and another man picked up the marijuana.
 
 
 13
 Excell also knew about and voluntarily participated in this conspiracy. Hutchinson introduced Dyer to "Donald" in November 1989, three months after the conspiracy began. Inspector Henry confirmed "Donald's" voice to be Excell's. Furthermore, Dyer's identification of Excell and Excell's possession of Hutchinson's home phone and beeper numbers confirmed "Donald's" identity. In addition, Excell's telephone billing records established numerous calls to Hutchinson's phone and beeper, to Henry's undercover phone in Buffalo, New York, and to Jamaica, including several on the day the marijuana arrived in Baltimore. Credit card receipts also established that Excell had travelled to Jamaica twice during the conspiracy.
 
 
 14
 While Excell did not initiate the plan to bribe the customs inspectors, he is still liable for the acts of his co-conspirators committed in furtherance of the conspiracy prior to his entry into the conspiracy. See United States v. Blackmon, 839 F.2d 900, 911 (2d Cir.1988); United States v. Spoone, 741 F.2d 680, 688 (4th Cir.1984), cert. denied, 469 U.S. 1162 (1985). In addition, Excell's stated precondition for participating in the scheme was the bribery of Henry and Paletti, and he agreed to additionally compensate Paletti for the delay in the arrival of the marijuana. Therefore, there is an adequate basis for the jury to convict Excell on the conspiracy to bribe count.
 
 
 15
 There was also an adequate basis for the jury to convict Excell on the conspiracy to possess with the intent to distribute and conspiracy to import charges. Because these are statutorily separate offenses requiring different proofs of fact, this court must find that Excell entered into a conspiratorial agreement that encompassed distribution as well as importation. United States v. Manbeck, 744 F.2d 360, 387 (4th Cir.1984), cert. denied, 469 U.S. 1217 (1985). The fact that the conspiracy's marijuana came in from Jamaica and Trinidad and arrived in the United States adequately supports the conspiracy to import charge. Id. at 385-87. The amount of marijuana involved supports a jury inference that the marijuana was intended for distribution and not for personal use. United States v. Wooten, 688 F.2d 941 (4th Cir.1982). Excell's counsel admits that "[o]bviously the marijuana was going to be distributed," but argues that the government did not meet its burden to prove that Excell was going to distribute it. Appellant's Brief at 15. Dyer's testimony that he was going to deliver half the marijuana to Excell and evidence concerning Excell's participation and therefore responsibility for the acts of his co-conspirators during the conspiracy is sufficient to meet the government's burden, however. Therefore, we affirm Excell's convictions on all three conspiracy counts.
 
 B
 
 16
 Excell also attacks the legal sufficiency of the jury's verdict with respect to the substantive crimes of Count IV, possession of marijuana with the intent to distribute (21 U.S.C. § 841(a)(1)), and of Count VI, importation of marijuana (21 U.S.C. §§ 952, 960). Excell argues that the evidence supporting his conviction of possession with the intent to distribute is insufficient because he never had even constructive possession of the marijuana; he never had possession of the shipping documents and the government did not show any intent to distribute. Excell further argues that the evidence of importation is lacking because there is no evidence that he knew what was being imported.
 
 
 17
 As this court has stated, under the rule established in Pinkerton v. United States, 328 U.S. 640 (1946), "a conspirator may be convicted of substantive offenses committed by co-conspirators in the course of and in furtherance of the conspiracy." United States v. Chorman, 910 F.2d 102, 111 (4th Cir.1990). In order for the Pinkerton Rule to apply, the jury must be satisfied beyond a reasonable doubt (1) that the substantive offense was in fact committed by one or more members of the conspiracy; (2) that the defendant whose guilt it is considering was then a member of the conspiracy when the substantive crime was committed; and (3) that the act which constituted the offense was done in furtherance of that conspiracy and was a foreseeable part of that conspiracy. The court below gave a proper Pinkerton instruction.
 
 
 18
 We consider first the possession with the intent to distribute count. (1) Dyer was a member of the conspiracy when he actually possessed the marijuana; (2) Excell was still a member, indeed, half of the marijuana was to go to him; (3) and even though Excell never possessed the shipping documents, possession by a co-conspirator was clearly in furtherance of and an entirely foreseeable part of the conspiracy. In addition, the jury could legitimately infer the intent to distribute element of the substantive offense from the quantity of drugs involved. Therefore, the evidence is sufficient to establish Excell's possession with the intent to distribute.
 
 
 19
 Second, we consider the importing count. While it is true that the word "marijuana" was nowhere mentioned on the government's tapes, the jury could certainly infer that that was the substance being imported. Excell was concerned with the degree of control that Henry's partner had with the Customs Service, with narcotics detecting dogs, the quantities of drugs that could be imported, the use of non-stop flights, and the difficulties with security in Jamaica. Dyer testified to two meetings with Excell about his Jamaican marijuana connections and the size of the marijuana shipment. Finally, the 500 pounds of marijuana did arrive; Excell repeatedly tried to contact Henry to determine that it arrived; and thereafter Excell called Jamaica, apparently to assure his Jamaican contacts of the arrival. This evidence cumulatively provides sufficient support for the jury's finding that Excell knew that it was indeed marijuana that he was importing, so the government met its burden on the importation of marijuana charge.
 
 III
 
 20
 Excell argues that his trial violated his Fifth Amendment rights against self-incrimination under the principles of Miranda v. Arizona, 384 U.S. 436 (1966), because the district court admitted into evidence an audiotape that the Customs agents made during a booking interview of him. Excell acknowledges that the government could ask him questions, even after he had invoked his Miranda rights, concerning his name, address, height, weight, color of eyes, wife's name, and employment status without violating his constitutional protections. However, Excell argues that the government could not elicit information concerning his place of birth, citizenship, educational background and ownership interests in real property because these questions established a "testimonial" nexus between him and Jamaica and a financial ability to import marijuana that prejudiced him before the jury. In addition, Excell argues that this information should not have been tape recorded and should not have been, over his objection, presented to the jury.
 
 
 21
 The Self-Incrimination Clause of the Fifth Amendment provides that no "person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. The privilege "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." Schmerber v. California, 384 U.S. 757, 761 (1966). In this case, it is true that the police obtained information from Excell after he had validly invoked the Fifth Amendment's protection against self-incrimination. However, the Supreme Court in Pennsylvania v. Muniz, --- U.S. ----, 110 L.Ed.2d 528 (1990), implicitly allowed a "routine booking question" exception to Miranda to secure the "biographical data necessary to complete booking or pretrial services." Id. at 552 (plurality opinion).[2] The Fourth Circuit also allows police to take standard identification and personal information such as name, age, and place of birth, under the theory that such questioning is directed to the administrative processing of those in custody and thus is not interrogation of the sort addressed in Miranda. United States v. Taylor, 799 F.2d 126, 128 (4th Cir.1986), cert. denied, 479 U.S. 1093 (1987). In Taylor, as in this case, the police advised the suspect of his Miranda rights and the suspect refused to answer questions until he had obtained a lawyer. The police nevertheless asked the suspect his name, and he first gave a false name and then his real one. This information was used at trial to disprove his alibi. According to this court:
 
 
 22
 Although Taylor invoked his right to counsel, the officers' subsequent questioning of him concerning his identity did not amount to an interrogation prohibited by Miranda. The fact that Taylor's response later proved to be incriminating does not require that it be suppressed, as the officers had no reasonable expectation that their questions would be likely to elicit such information.
 
 
 23
 Id. at 128.
 
 
 24
 Muniz and Taylor control the interview in this case. The questions asked for "basic personal information" reasonably related to the Customs Service's valid administrative and pretrial needs. Muniz, 110 L.Ed.2d at 552. Customs Service personnel routinely ask these questions from an arrest processing form for valid administrative, booking, and pretrial release reasons. For example, birth and citizenship questions relate to a suspect's legal status in this country and Customs recordkeeping, educational information helps inform agents of the suspect's ability to understand the arrest process; and information about property interests helps evaluate the suspect's suitability for pretrial release. The officers had "no reasonable expectation that their questions would be likely to elicit [incriminating] information," Taylor, 799 F.2d at 128, and thus even if this information prejudiced Excell at trial, it should not be suppressed. See also United States v. Rodriguez, 888 F.2d 519, 525 (7th Cir.1989) (evidence gained from police questions to suspect about ownership interests in properties and bank accounts admissible even after defendant asked that his lawyer be present under "booking questions" rule described in United States v. Doe, 878 F.2d 1546, 1550-52 (1st Cir.1989)).
 
 
 25
 In any case, we are convinced that the admission of the tape to the jury did not prejudice Excell; if there were any error, and we hold there was not, any error was harmless. The government had a plethora of other information linking Excell to Jamaica and demonstrating his ability as "financier" to import the marijuana: testimony that he has a Jamaican accent; telephone records that he called Jamaica several times, including the day the marijuana was delivered; credit card receipts that he twice flew to Jamaica during the conspiracy and stayed in hotels there; and testimony from co-conspirators and Inspector Henry that his job in the conspiracy was to use his connections to procure marijuana from Jamaica, which he did.
 
 
 26
 The fact that this information was tape recorded does not change this result. The Supreme Court held in United States v. Dionisio, 410 U.S. 1 (1973), that the compelled production of voice exemplars for purposes of identification does not violate the Fifth Amendment. Id. at 7. The Court reasoned that "the voice recordings were to be used solely to measure the physical properties of the witnesses' voices, not for the testimonial or communicative content of what was to be said." Id. (footnote omitted). That is the case here. The interview was tape recorded with Excell's knowledge and we credit the government's argument that it was made for the purely identification purpose of matching Excell's voice with that of the "Donald" who spoke in eight conversations with Agent Henry. We therefore uphold the district court's approval of the submission of the tape to the jury.
 
 IV
 
 27
 Excell argues that the district court erred in admitting into evidence a transcript prepared by Inspector Henry of telephone conversations in which he was a party. The court first admitted the tapes of the conversations and the transcript into evidence under the belief that the transcript was a translation of Jamaican Patois into English. It soon became clear that the transcript was not a translation, but rather a verbatim transcription of the mixture of English and Patois spoken on the tapes. The court then changed its ruling and permitted the jury to use the transcript merely as an aid. It instructed the jury as follows:
 
 
 28
 What I mean by that, ladies and gentlemen, you are listening to these tapes and you are reading the transcript. The tapes constitute the evidence, as I have said before, and the transcript, again, is only an aid. In the event of any discrepancy between the tape and the transcript, it would appear that what you listen to on the tape will in every instance govern.
 
 
 29
 J.A. 56. This limiting instruction is proper and the district court committed no error concerning the transcripts of these tapes. See United States v. Rengifo, 789 F.2d 975, 980-84 (1st Cir.1986) (reviewing case law and upholding district court's submission of transcript to jury as aid).
 
 V
 
 30
 For the aforementioned reasons, Excell's convictions in all respects are
 
 
 31
 AFFIRMED.
 
 
 
 [1]
 Excell does not allege error in the disposition of the suppression motions
 
 
 [2]
 The portion of the Court's opinion holding a "booking exception" is in Justice Brennan's plurality opinion for four members of the Court. Justice Rehnquist, also writing for four Justices, affirmed the admittance of the questioned information, a videotape of the suspect's booking for driving while intoxicated, on the alternative grounds that the booking questions were not testimonial and did not implicate Fifth Amendment concerns at all. In a separate part of Justice Rehnquist's discussion, however, he also seems to accept the "booking exception." 110 L.Ed.2d at 556