976 F.2d 727
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of AMERICA, Plaintiff-Appellee,
v.
Harry Fremont BARR, a/k/a Harry Junior Barr, Defendant-Appellant.
 No. 91-5108.
 United States Court of Appeals,
Fourth Circuit.
 Argued: May 6, 1992
Decided: Sept. 17, 1992
 
 Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Terrence W. Boyle, District Judge. (CR-90-45-2-5)
 Argued: Leonard G. Ambrose, III, Ambrose & Friedman, Erie, Pennsylvania, for Appellant.
 Kristna Lynn Ament, United States Department of Justice, Washington, D.C., for Appellee.
 On Brief: Thomas K. Maher, David S. Rudolf, Beskind & Rudolf, P.A., Chapel Hill, North Carolina, for Appellant.
 Margaret Currin, United States Attorney, Eric Evenson, Assistant United States Attorney, Raleigh, North Carolina, for Appellee.
 E.D.N.C.
 AFFIRMED.
 Before RUSSELL and WILKINS, Circuit Judges, and WILLIAMS, Senior United States District Judge for the Western District of Virginia, sitting by designation.
 PER CURIAM:
 
 OPINION
 
 1
 Harry Fremont Barr, Jr., appeals his drug trafficking convictions under 18 U.S.C. §§ 924(c)(1)-(2), 1952 (1988), and 21 U.S.C. §§ 841(a)(1), 843(b), 846 (1988), arguing that the United States Attorney's statements in the district court denied Barr his privilege against self-incrimination under the Fifth Amendment, and his due process right to a fair trial. We affirm Barr's convictions.
 
 I.
 
 2
 The evidence introduced at Appellant Barr's trial in the district court showed that, during 1988, Barr's co-conspirator Harvey Bartlett Raynor trafficked regularly in cocaine and marijuana. On at least one occasion, Appellant Barr travelled from Cambridge, Ohio, to Raynor's home near Coats, North Carolina, in order to purchase marijuana from Raynor in multiple pound quantities. Upon Barr's offer also to buy cocaine from Raynor, Raynor informed Barr that he had recently ended his relationship with his usual cocaine supplier. Appellant Barr responded that he knew of a "connection" in Florida who might sell Raynor and Barr cocaine in distribution quantities. (J.A. at 79, 90.) Barr subsequently joined Raynor and other co-conspirators on four separate trips to Florida during 1988 and early 1989 in order to purchase cocaine.
 
 
 3
 Harvey Bartlett Raynor testified that on the first of these four trips he drove to Florida with Dana Humbarger, Ronnie Anderson, and his brother, James Raynor. Barr flew to Florida. Harvey Raynor testified that, prior to the first cocaine transaction, Barr requested that Raynor give him a gun. Because Barr "couldn't fly with a gun," Raynor gave Barr a .38 caliber handgun which Raynor had transported to Florida by automobile. Harvey Bartlett Raynor testified that he therefore knew that Barr "had one on him" during the first cocaine transaction. (J.A. at 91.) Barr, Harvey Bartlett Raynor, and a man named Bruce Bridges then met in a motel room to negotiate the sale of one kilogram of cocaine. Raynor testified that James Raynor, Humbarger and Anderson remained outside in a car "watching the room" to make sure Raynor "wouldn't get ripped-off." (J.A. at 92.) The group then drove to Bridges' home in Del Ray, Florida, to conduct the drug transaction. However, when the group arrived at Bridges' home, Bridges informed them that "it was a no go"-that they would not be able to conduct the transaction because Bridges could not reach his"connection." (J.A. at 97, 99.) According to Raynor, Appellant Barr then became very agitated, and suggested killing Bridges. Raynor declined. Bridges then talked to his wife, who somehow arranged for Bridges to "take the money to the connection's house." (J.A. at 99.) After Raynor furnished Barr with a .44 caliber magnum handgun, Bridges and Barr proceeded to the "connection's house" with money to purchase the cocaine, and returned later with one kilogram of the drug. Raynor's co-conspirators then returned to North Carolina, where Barr received about eight ounces of the cocaine before departing for Cambridge, Ohio.
 
 
 4
 Subsequent trips followed a similar pattern. After telephone conversations between Harvey Bartlett Raynor, Bruce Bridges, and Appellant Barr, Raynor, Barr and the other conspirators would travel to Florida and meet Bridges, who would obtain the cocaine for the transaction from his local supplier. The conspirators made the trips on two to four week intervals. Generally, the conspirators would purchase the cocaine in one kilogram quantities; however, Harvey Bartlett Raynor testified that on the fourth trip, Barr"purchased a whole kilo by himself" and that he, Raynor, also "purchased a kilo." (J.A. at 167.) Raynor testified he usually resold the cocaine for $500 to $700 per half-ounce. On the fourth trip, Barr also"got a little upset" with Raynor because he did not bring a gun to the drug transaction. (J.A. at 172.) According to Raynor, Barr stated the group "should always bring ... guns" to the transactions "in case of a rip-off," i.e., in case the cocaine suppliers attempted to take the conspirators' money without providing cocaine in return. (J.A. at 173.)
 
 
 5
 At Barr's trial in the district court, co-conspirators James Raynor, Dana Humbarger and Ronnie Anderson also testified, and corroborated Harvey Bartlett Raynor's account of the drug transactions. The government introduced into evidence long-distance telephone records showing numerous calls between Appellant Barr, Raynor and Bruce Bridges. These telephone records showed calls to Bridges prior to each of the four trips that the co-conspirators made to Florida. The government also introduced hotel receipts showing that Appellant Barr occupied the same hotels in Florida as co-conspirators Harvey Bartlett Raynor, James Raynor, Dana Humbarger and Ronnie Anderson on dates corresponding to the trips detailed in Harvey Bartlett Raynor's testimony. Moreover, the government introduced handguns which Harvey Bartlett Raynor identified as those carried by the conspirators in the course of their drug transactions. Barr did not testify at his trial.
 
 
 6
 The Appellant was convicted of using and carrying a firearm in connection with a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)-(2) (1988), interstate transportation in aid of racketeering, in violation of 18 U.S.C. § 1952 (1988), possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) (1988), using a communication facility in connection with a cocaine distribution offense, in violation of 21 U.S.C.s 843(b) (1988), and conspiracy to possess with intent to distribute cocaine and conspiracy to distribute cocaine, in violation of 21 U.S.C.s 846 (1988). Barr appeals.
 
 II.
 
 7
 Barr first argues that the district court erred in refusing to grant him a mistrial based on the United States Attorney's impermissible references to Barr's failure to testify at his trial. After Barr's attorney argued in his closing statement that the evidence showed Barr had travelled to Florida only to solicit investors for a legitimate oil venture, the government responded on rebuttal:
 
 
 8
 And what has Harry Barr done in this case? Well, the first thing he told you in his opening statement was yeah, I went on four trips. Of course he went on four trips because how's he going to get around that when the phone records and hotel records show that....
 
 
 9
 Now, isn't it interesting not so much what he did tell you but what he did not tell you.... You know he's down in Ocala, he's down in Yeehaw Junction.... And then he's back in North Carolina; he's on the phone. What is he doing? What is he down there for? Why doesn't he just come out and say it?
 
 
 10
 (J.A. at 732-33.)
 
 
 11
 The United States Attorney continued, "Apparently he admits going on the trips, he admits being down there; he admits the guns. Did he say anything about the guns? He hasn't denied the guns." (J.A. at 736.)
 
 
 12
 Barr's counsel objected to portions of both of the above comments and moved for a mistrial. The district court denied the motion for mistrial based on the comments of the United States Attorney. On appeal, Barr contends that the above-quoted comments were impermissible prosecutorial references to Barr's refusal to testify at trial in violation of his constitutional rights as articulated in Griffin v. California, 380 U.S. 609 (1965). In Griffin, Justice Douglas wrote for the majority, "[T]he Fifth Amendment ... forbids ... comment by the prosecution on the accused's silence." 380 U.S. at 615.
 
 
 13
 The Fourth Circuit has recognized "that '[c]rafty questioning may constitute "comment" despite its obliquity.' " United States v. Whitehead, 618 F.2d 523, 527 (4th Cir. 1980) (quoting United States v. Helina, 549 F.2d 713, 718 (9th Cir. 1977)). However, this court also observed,
 
 
 14
 The test for determining whether an indirect remark constitutes improper comment on a defendant's failure to testify is: "Was the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."
 
 
 15
 Whitehead, 618 F.2d at 527 (quoting United States v. Anderson, 481 F.2d 685, 701 (4th Cir. 1973), aff'd, 417 U.S. 211 (1974). Under this test, we do not find that the complained-of remarks, when viewed in context, constitute improper comment on Barr's refusal to testify at trial. The United States Attorney initially stated on rebuttal of defense counsel's closing statement that "the first thing he told you in his opening statement was yeah, I went on four trips." (J.A. at 732) (emphasis added). Barr, obviously, did not make the opening statement; the jury was aware that Barr never testified at trial. The jury, therefore, could not have understood the United States Attorney's use of pronoun "he" in the above statement to refer to Barr. Rather, the pronoun "he" referred to Barr's attorney, or more specifically, the argument advanced by Barr's attorney at trial. The U.S. Attorney's subsequent references in the above-quoted statements to "he" would also be understood by the jury as references to the defense counsel's argument for Barr's innocence. Hence, the U.S. Attorney's observation, "[H]e admits going on the trips, he admits being down there; he admits the guns," (J.A. at 736), and his questions, "What is he down there for? Why doesn't he just come out and say it?" (J.A. at 733), would be interpreted by the jury as comments upon the defense argument's lack of a plausible explanation for Barr's trips to Florida, rather than as a comment upon Barr's failure to testify. Viewing the challenged remarks in context, we cannot say that the U.S. Attorney's language was "manifestly intended to be," or was "of such character that the jury would naturally and necessarily take it to be" a comment on the failure of the accused to testify. We therefore conclude the district court did not err in refusing to grant Barr a mistrial based on the challenged criticisms of Barr's defense argument.
 
 
 16
 Barr next argues that he was denied his due process right to a fair trial by the prejudicial remarks of the United States Attorney regarding the harmfulness of cocaine to the residents of Harnett County, North Carolina-an area presumably close to home for the jurors serving in Barr's case-and regarding defense counsel's strategy at trial. In an initial closing statement, the U.S. Attorney remarked, "He's travelling ... all the way back to the Eastern District with the dope, with the cocaine that was poured into Harnett County. The poison was poured there." (J.A. at 706.) Defense counsel timely objected. The district court sustained the objection and granted Barr's motion to strike. The U.S. Attorney immediately continued,"And what ... happened with the cocaine when it got to Harnett County, the cocaine he helped bring into this state? I suggest to you a lot of people suffered from it." (J.A. at 707.) Again, defense counsel timely objected. The district court sustained the objection, instructed the jury to "disregard that part of the argument," and warned the U.S. Attorney not to "argue about prejudicial things." (J.A. at 707.)
 
 
 17
 On rebuttal of defense counsel's closing statement, the U.S. Attorney remarked, "He's just created, I argue to you, an innuendo that there was something else going on down there. Now, then almost like a caged, hissing animal, he's accused...." (J.A. at 737.) An objection from defense counsel interrupted this remark. The district court sustained the objection, and instructed the jury to"disregard that characterization." Id. At a bench conference immediately thereafter, the district court informed counsel that the court was"weighing the cumulative effect of all this and decid[ing] what point it's prosecutorial misconduct as a matter of law." (J.A. at 738.) The district court denied a subsequent defense motion for a mistrial.
 
 
 18
 As to the United States Attorney's remarks regarding the harmfulness of cocaine to the residents of Harnett County, this court is of the view that such remarks were improper and, indeed, came perilously close to prosecutorial misconduct. However, we cannot say that these remarks so utterly prejudiced Barr's defense as to deny Barr his due process right to a fair trial. In United States v. Harrison, the Fourth Circuit identified the following four factors as central to determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters. 716 F.2d 1050, 1052 (4th Cir. 1983), cert. denied, 466 U.S. 972 (1984). First, when judged solely on the competent evidence which the U.S. Attorney properly presented at trial, Barr's guilt on the charged offenses appears manifest. We therefore cannot say that the challenged remarks seriously misled the jury regarding Barr's guilt or innocence. Moreover, in light of the district court's curative instructions to the jury to disregard potentially prejudicial arguments and characterizations, we are unpersuaded that Barr was significantly prejudiced at trial. Second, we observe that excerpts from Barr's trial proceedings occupy over 700 pages of the joint appendix which the parties filed with the Fourth Circuit pursuant to Barr's appeal. The challenged remarks are found on a scant three pages of this lengthy transcript. Hence, we perceive that the challenged remarks tend to be more isolated than extensive. Third, this court is of the view that, absent the challenged remarks, the evidence showing Barr's guilt at trial was strong. Three witnesses who participated in the drug transactions, James Raynor, Dana Humbarger and Ronnie Anderson, confirmed Harvey Bartlett Raynor's account of Barr's involvement in those transactions. The testimony of all four of these witnesses was corroborated by telephone and hotel records placing Barr at specified locations during the relevant time frames. We are thus confident that the government assembled formidable evidence of Barr's guilt on the charged offenses. Fourth, we cannot say that the U.S. Attorney's challenged comments were deliberately placed before the jury to divert attention to extraneous matters. While the U.S. Attorney's characterizations of cocaine as "poison" and his references to human suffering appear inflammatory, such comments arose in the context of the U.S. Attorney's description of Barr's transport of a controlled substance across state lines-an element of the offense charged under 18 U.S.C. § 1952 (1988). Elements of charged offenses cannot be viewed as extraneous matters. Based on the four factors this court noted in Harrison, 716 F.2d at 1052, we therefore conclude that the improper prosecutorial comments challenged here do not warrant reversal.
 
 
 19
 With respect to the United States Attorney's characterization of defense counsel's tactics as "almost like a caged, hissing animal," (J.A. at 737), we are again of the view that such a remark constitutes disturbing prosecutorial misconduct. Again, however, we do not find that this remark denied Barr his due process right to a fair trial. The Supreme Court has stated that the inquiry into whether a comment disparaging the integrity of counsel denied the defendant his due process right to a fair trial must take into account both the prosecution's challenged remark and defense counsel's conduct. United States v. Young, 470 U.S. 1 (1985). Thus,
 
 
 20
 [T]he reviewing court must not only weigh the impact of the 6350 67 4 prosecutor's remarks, but must also take into account defense counsel's opening salvo. Thus the import of the evaluation has been that if the prosecutor's remarks were "invited," and did no more that respond substantially in order to "right the scale," such comments would not warrant reversing a conviction.
 
 
 21
 470 U.S. at 12-13. Defense counsel in Young stated in his closing summary that the prosecution's " 'statements have been made to poison your minds unfairly.' " 470 U.S. at 4. Defense counsel then proceeded to describe the prosecution's conduct as " 'reprehensible,' " and to suggest that even the prosecutor himself did not believe the case which the government had presented. Id . at 4-5. While the prosecutor made no contemporaneous objection to these remarks, the prosecutor stated to the jurors on rebuttal that they would not be "doing [their] job as jurors" were they to acquit the defendant. 470 U.S. at 6. Defense counsel made no contemporaneous objection to this comment. The Supreme Court determined that, absent a timely objection from defense counsel, the prosecutor's remark did not rise to the level of "plain error" which a reviewing court could properly act upon pursuant to Fed. R. Crim. P. 52(b), and further determined that the remark did not undermine the fundamental fairness of the trial. 470 U.S. at 16.
 
 
 22
 In his closing statement here, defense counsel stated as to one of the testifying co-conspirators, Ronnie Anderson,"You'd better board up your windows-because he'll be in it. Just like a cockroach. He'll be in that house. He knows one thing and one thing alone. That's crime." (J.A. at 712.) In closing, defense counsel also referred to the other testifying co-conspirators as, among other things, "liars, thieves, burglars, and convicted felons," "manipulators," and "a bunch of jail birds[,][b]ig ones, small ones." (J.A. at 710-11.) On rebuttal, the U.S. Attorney responded with the challenged remark regarding "a caged, hissing animal."
 
 
 23
 We are aware, of course, that the instant case is somewhat distinguishable from Young in that Barr's attorney timely objected to the challenged remark, whereas counsel in Young made no objection. 470 U.S. at 6. However, despite the absence here of a requirement that Barr show plain error under Fed. R. Crim. 52(b), we are nonetheless persuaded that, when viewed in the context of Barr's attorney's conduct, the U.S. Attorney's challenged remark does not constitute reversible error. Defense counsel's "opening salvo" in this case, noted above, was at least as inflammatory as the United States Attorney's challenged remark. We find under Young, 470 U.S. at 12-13, that the U.S. Attorney's challenged remark was thus provoked, or "invited," and did little more than "right the scale" in the wake of defense counsel's inflammatory comments. Accordingly, we conclude that the challenged remark did not deny Barr his due process right to a fair trial.
 
 
 24
 Barr next argues that he was denied his due process right to a fair trial by the United States Attorney's discussion of terms of the testifying co-conspirators' plea agreements with the government. Specifically, Barr contends that the U.S. Attorney's statements regarding the government's plea agreements with testifying co-conspirators constituted improper vouching for the credibility of those testifying coconspirators in violation of Barr's due process right to a fair trial. In his opening statement, the U.S. Attorney asserted,
 
 
 25
 [T]hese individuals ... have already pled guilty and they have entered into plea agreements with the ... government.... [T]hose plea agreements ... will say to you that the defendant understands that should the ... United States Attorney for the Eastern District of North Carolina determine that the defendant has given incomplete, false or misleading ... testimony, this memorandum of plea agreement shall be considered null and void.
 
 
 26
 (J.A. at 39-40.)
 
 
 27
 Barr's attorney objected to the above statement, and moved for a mistrial. The district court sustained the objection. However, the court denied a defense motion for a mistrial, and gave the jury the following cautionary instruction:
 
 
 28
 You are ... not to consider at all the extent to which the government vouches or claims the truthfulness of the witnesses that they put up on the stand. In other words, whether or not a witness is telling the truth is up to you to decide.... [T]he government ... can't call a witness and then say because I called this witness this witness is therefore telling the truth because I only call truthful witnesses.... That's a circular kind of logic that ... doesn't have any place in the trial of the case.
 
 
 29
 ... [F]or the purposes of the trial of this case right now, insofar as the forecast of the evidence and the proof of the evidence, you need not concern yourself with what somebody pled at another time ... in another case.
 
 
 30
 (J.A. at 46-47.)
 
 
 31
 In addressing the "propriety of eliciting a plea bargain promise of truthfulness where ... the defense has not indicated that it intends to use the plea bargain to attack the witness's credibility," the court in United States v. Henderson observed that prior decisions indicated that the Fourth Circuit perceives "no error in permitting the government to elicit details of a plea agreement regardless of the defense's intentions concerning its use for impeachment purposes." 717 F.2d 135, 138 (4th Cir. 1983), cert. denied, 465 U.S. 1009 (1984). Thus, where a U.S. Attorney elicited on direct examination of a testifying co-conspirator the terms of that witness' plea agreement with the government, including the co-conspirator's promise to give truthful testimony, we observed,
 
 
 32
 [T]here is no evidence that the government derived any improper advantage from [the witness'] testimony concerning his promise to be truthful. The prosecutor's questions [did] not imply that the government had special knowledge of the [co-defendant's] veracity. The trial judge instructed the jury on the caution necessary in evaluating testimony given pursuant to a plea bargain. Henderson makes no claim that the prosecutor made improper use of the plea bargain promise of truthfulness in closing argument. The promise was not "disproportionately emphasized or repeated."
 
 
 33
 717 F.2d at 138 (citation omitted). This court therefore concluded that "the district court did not abuse its discretion in permitting the government to introduce the terms of [the testifying co-conspirator's] plea bargain during the government's case in chief." 717 F.2d at 138.
 
 
 34
 Here, similarly, the challenged statement cannot be interpreted as implying that the government had special knowledge, beyond that available to the jurors, of the testifying co-conspirators' veracity. Moreover, the district court gave the jury a cautionary instruction that the jurors themselves were to gauge the veracity of the witnesses, rather than relying on government endorsements of the witnesses' truthfulness. Barr presents no claim that the U.S. Attorney made improper use of the plea bargain in closing argument. Finally, on the single statement at issue here, we cannot say that the promise was disproportionately emphasized or repeated.
 
 
 35
 The United States Attorney here, of course, introduced the testifying co-conspirators' agreement to give truthful testimony in his opening statement, rather than, as in Henderson, 717 F.2d at 136, on direct examination of the witness. On the facts of this case, however, we do not perceive this distinction as material. We therefore conclude that the U.S. Attorney did not improperly bolster the testifying coconspirators' credibility in violation of Barr's due process right to a fair trial.
 
 
 36
 The remaining issue that Barr raises on appeal does not warrant discussion.
 
 
 37
 For the foregoing reasons, the judgment of the district court is hereby
 
 
 38
 AFFIRMED.